# LOAN AGREEMENT

This **LOAN AGREEMENT** (this "Agreement") dated as of May 17, 2024 (the "Effective Date") is by and between **STORYFILE, INC.**, a Delaware corporation ("Borrower") and **KEY 7 INVESTMENT COMPANY, INC.,**  an Alabama corporation ("Lender").

## Recitals

A.　　On May 5, 2024 (the "Petition Date"), Borrower commenced Case No. 24-22398-shl (the "Case") in the United States Bankruptcy Court for the Southern District of New York (the "Court") seeking relief under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code").

B.　　Borrower desires to obtain post-petition loans and other advances from Lender, on the terms and conditions herein set forth in this Agreement and in the Financing Order (as defined below). Lender has indicated a willingness to grant the DIP Facility (as defined below) to Borrower, subject to the terms and conditions hereof and to other DIP Loan Documents (as defined below).

## Agreement

In consideration for the above premises and the mutual promises and covenants herein contained, Borrower and Lender do hereby agree as follows:

1.　　Defined Terms. In addition to the defined terms set forth elsewhere herein, the following terms shall have the following meanings:

"Budget" means the rolling consolidated 13-week cash flow and financial projections of Borrower covering the period ending on August 3, 2024 attached hereby as **Exhibit A**, and itemizing on a weekly basis all uses, and anticipated uses, of the DIP Facility, revenues or other payments projected to be received and all expenditures proposed to be made during such period, which shall at all times be in form and substance reasonably satisfactory to the DIP Lender, which Budget may be amended only by the written consent of Lender.  Borrower shall not make or commit to make any payments other than those identified in the Budget. Notwithstanding the foregoing and with the exception of Discretionary Expenses (defined below), Borrower shall not permit aggregate expenditures under the Budget to exceed one hundred and fifteen percent (115%) of the total budgeted expenses or aggregate cash receipts under the Budget to be less than eighty-five percent (85%) of the total budgeted cash receipts, in each case calculated on a rolling two-week basis commencing as of the date of commencement of the Petition Date, with the first such testing to begin two weeks after the Petition Date.  Subject to the terms of this Agreement, including but not limited to the Draw Procedure, budgeted expenditures and cash receipts may be paid and received, as applicable, in an earlier or later period in the reasonable discretion of the Borrower, in which event, the Budget shall be deemed so amended for the purpose of calculating variances.

"Cash Collateral Account" shall mean the post-petition operating account(s) maintained by Borrower in accordance with orders of the Court.

"Carve-Out" shall mean (i) the costs and administrative expenses permitted to be incurred by any Chapter 7 trustee under Section 726(b) of the Bankruptcy Code pursuant to an order of the Court following any conversion of the Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code in an amount not to exceed $25,000; (ii) the (a) fees and expenses projected in the Budget and incurred by the Borrower's professionals or the professionals of the Committee prior to an Event of Default and allowed by the Court, plus (b) up to $50,000 in the aggregate to pay any allowed fees and expenses incurred by the Borrower's professionals following occurrence of an Event of Default; and (iii) the payment of fees pursuant to 28 U.S.C. § 1930.

"Closing Date" shall mean the date on which each of the Conditions Precedent to Close shall have been satisfied or waived by Lender. The Closing Date shall occur as promptly as is practical after the entry of the Interim Order by the Court.

"Conditions Precedent to the Close" The obligations of Lender to consummate the transactions contemplated herein and make the DIP Facility available to Borrower are subject to the satisfaction, in each case in the sole judgment of the DIP Lender, of (i) the Interim Order shall be in full force and effect, and shall not have been appealed, reversed, modified, amended, stayed for a period of five (5) business days or longer, vacated or subject to a stay pending appeal, in the case of any modification, amendment or stay pending appeal, in a manner, or relating to a matter, that is or may be materially adverse to the interests of Lender, and (ii) Lender shall have received and approved the Budget.

"DIP Facility" shall mean that certain secured debtor-in-possession credit facility made available to the Borrower by Lender in the principal amount of up to $900,000.00 (inclusive of Discretionary Expenses), comprised of new term loans made by, and other obligations owed by Borrower to Lender from time to time, as further described in this Agreement, the Loan Documents, and the Financing Order, as amended or modified.

"DIP Loan Documents" shall mean and include the this Agreement and other agreements, documents and instruments now or hereafter evidencing, securing, guaranteeing or relating to the DIP Facility or any of the other liabilities, obligations or indebtedness of Borrower to Lender, as the same may be amended.

"Discretionary Expenses" shall mean expenses not specifically included in the Budget up to the aggregate amount of $100,000.00, but are subject to the discretion of the Borrower provided that prior written approval of such expenses is required by the Lender (which approval shall not be unreasonably withheld).  In the event a dispute arises over the Lender's approval of such discretionary expense, Debtor shall have the right to seek approval by the Court of such spending over the Lender's objection.

"Financing Order" means, the Court's entry of an interim order approving this Agreement and the transactions contemplated hereby and grants the superpriority claim status and senior priming and other liens contemplated in this Agreement and any subsequent Court order relating hereto (the "Interim Order"), including the final order relating to the DIP Facility (the "Final Order"), in each case which order shall be in form and substance satisfactory to Lender in its sole and absolute discretion and shall not have been stayed, vacated, reversed or rescinded.

"Indebtedness" includes all items that in accordance with generally accepted accounting principles would be included in determining total liabilities as shown on the liability side of a balance sheet as at the date as of which debt is to be determined, or to which reference should be made by footnotes thereto, but also includes reimbursement obligations, guaranties, endorsements (other than endorsements for collection or deposit in the ordinary course of business), and other contingent obligations in respect of, or to purchase or otherwise acquire or advance funds on account of or otherwise service, obligations of others.

"Lender's Security Interest" shall mean, subject to the Carve Out, all amounts owing by the Borrower pursuant to the terms of the DIP Loan Documents, as amended, (a) shall be entitled to super-priority claim status pursuant to section 364(c)(1) of the Bankruptcy Code with priority over any or all administrative expense claims of every kind and nature whatsoever, and (b) shall be secured by a perfected security interest pursuant to section 364(c)(2), section 364(c)(3) and section 364(d) of the Bankruptcy Code in all of the assets of the Borrower, as further described in Section 4 (Collateral) below.

"Maturity Date" shall be the earliest to occur of (i) September 30, 2024; (ii) the closing date following entry of one or more final orders approving the sale of all or substantially all of the assets belonging to the Borrower in the Chapter 11 Case, (iii) the acceleration of any outstanding amount owed to Lender following the occurrence of an uncured Event of Default, (iv) entry of an order by the Court in the Chapter 11 Case either (a) dismissing such case or converting such Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code, or (b) appointing a Chapter 11 trustee or an examiner with enlarged powers relating to the operation of the business of the Borrower (*i.e.*, powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code), in each case without the consent of Lender; or (iv) the confirmation of a Chapter 11 Plan of Reorganization by the Borrower. All amounts outstanding under the DIP Facility shall be due and payable in full, and any and all outstanding commitments thereunder shall terminate on the Maturity Date.

"Obligations" is used herein in its most comprehensive sense and includes any and all other advances, indebtedness, obligations, covenants, undertakings and liabilities of Borrower to Lender under the DIP Loan Documents or otherwise, now or hereafter made, incurred, or created, whether voluntary or involuntary and however arising, absolute or contingent, liquidated or unliquidated, determined or undetermined, whether or not same are from time to time reduced or extinguished and thereafter increased or incurred, whether Borrower may be liable individually or jointly with others, and whether or not presently contemplated by the parties on the date hereof, including all costs and expenses Lender may incur in the Case or otherwise, including to obtain, preserve and enforce Lender's Security Interest, collect the Obligations, and maintain and preserve Collateral (including taxes, assessments, insurance premiums, repairs, reasonable attorney fees, rent, storage costs and expenses of sale).

"Prime Rate" means the per annum rate publicly quoted from time to time by The Wall Street Journal as the "Prime Rate" in the United States (or, if The Wall Street Journal ceases quoting a base rate of the type described, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted

therein (as determined by Lender) or any similar release by the Federal Reserve Board (as determined by Lender)).

2.     Revolving Facility.

(a)     Amount, Interest and Uses.  Subject to the terms and conditions set forth herein this Agreement, the DIP Loan Documents and Financing Order and within the strict limits of the Budget, on or after the Closing Date, Lender agrees to lend to Borrower, on a revolving basis (the "DIP Facility") from time to time during the period commencing on the date hereof and continuing through the Maturity Date, such amounts as Borrower may request hereunder and which Lender may accept in its sole and absolute discretion; provided, however, the total principal amount outstanding at any time shall not exceed $900,000.00 (the "Borrower's Loan Limit"). Subject to the terms and conditions hereof, Borrower may borrow, repay and reborrow hereunder. The sums advanced under the DIP Facility shall be used to fund the operational, employee, and other costs of the Borrower, including, without limitation, payments authorized to be made under "first day" or "second day" orders, and payments related to the working capital and other general corporate purposes of the Borrower, including the payment of professional fees and expenses, and, in each case, consistent with, subject to, and within the categories and limitations contained in, the Budget (the "Permitted Uses").

On or after the Closing Date and prior to the Maturity Date, the available principal balance of the DIP Facility shall be comprised of the total aggregate amount available under the DIP Facility minus any voluntary, mandatory or other prepayments, other than payments of fees, costs and interest, made to the Lender by or on behalf of the Borrower.  Interest on the outstanding and unpaid principal balance shall accrue at the Prime Rate plus two (2) percent.  In no event shall the interest rate exceed the Maximum Interest Rate, as defined below.   Interest on this DIP Facility shall be computed on the basis of a 360-day year from the actual number of days elapsed in an interest period (actual/360 computation).

The DIP Facility shall be made available to Borrower for Permitted Uses (1) in a principal amount of up to $300,000.00 on or after the first business day following entry of the Financing Order (the "Initial Draw"), and (2) in an additional principal amount of $900,000.00 less the total amount of Initial Draw on or after the first business day following the entry of the Final Order (the "Final Draw" and together with the Initial Draw, each a "Draw" and collectively the "Draws"), subject to, in each case of the foregoing clauses (1) and (2), (a) no Default or Event of Default shall have occurred and be continuing as of the date of such Draw, and (b) the representations and warranties set forth herein shall be true and correct in all material respects as of the date of such Draw (unless (i) such representation or warranty, by its terms, expressly relates to another date, in which case such representation or warranty shall have been true and correct in all material respects on and as of such earlier date or (ii) such representation and/or warranty is already qualified by materiality, material adverse effect, or similar language, in which case such representation and warranty shall be true and correct in all respects, as of such date).

(b)     Draw Procedures.  Requests for Draws by the Borrower shall be honored by Lender in accordance with the following procedures (the "Draw Procedures"):

(i) *Written Request.* Other than with respect to the Initial Draw, Borrower shall have delivered to Lender a written request for a Draw at least five (5) business days prior to the date that the Draw will be disbursed to the Borrower. The request shall (i) specify the amount of the Draw, (ii) state the date that the Draw is requested, (iii) provide wiring instructions for the Draw, (iv) certify the Draw is consistent with the Permitted Uses, categories, amounts and timing of the Budget, and (v) certify that all conditions set forth above with respect to the Draws are and will be satisfied as of the date of the request and the date of the Draw.

(ii) *Amount.* On or after the first business day following entry of the Interim Order, the Borrower shall Draw $300,000.00 from the DIP Facility.

(c) <u>Repayment</u>. Except for mandatory prepayments (as described below), no repayments of any Draws under the DIP Facility shall be due until the Maturity Date. Upon the Maturity Date, the unpaid principal balance, together with all unpaid interest, fees, costs, expenses and any other amounts due under the DIP Facility shall be due and payable immediately in full without demand by Lender or consent or action by the Court. Borrower may voluntarily prepay the principal balance at any time without penalty or premium. Except as otherwise provided in the Budget, mandatory repayments of any Draws under the DIP Facility shall be required in an amount equal to (i) 100% of the net sale proceeds from non-ordinary course asset sales of the Collateral (including, without limitation, a sale of all or substantially all of the Borrower's assets), (ii) 100% of the proceeds of the incurrence of any indebtedness other than in the ordinary course of business, (iii) 100% of insurance proceeds received by Borrower (only in the event that such receipt is an extraordinary receipt that relates to an acquired asset and exceeds $250,000), and (iv) any condemnation proceeds received by Borrower.

3.   <u>Collateral</u>.

(a) Except as otherwise provided in the Financing Order upon Lender's express consent, all of the Obligations of Borrower to Lender shall be secured by a first priority Security Interest in and lien on all assets (tangible, intangible, real, personal and mixed) of the Borrower, whether now owned or hereafter acquired, including, without limitation, deposit and other accounts, inventory, equipment, receivables, capital stock or other ownership interest in subsidiaries, investment property, instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks, and other general intangibles, and all products and proceeds thereof, and, upon entry of the Financing Order, any proceeds of avoidance actions available to the Borrower's bankruptcy estates, subject only to the Carve-Out. As used in the preceding sentence, "assets" includes all assets of the Borrower, wherever located, and whether now existing or hereafter arising and whether now owned or hereafter acquired, together with all proceeds and products thereof, and accessions, accessories and improvements thereto, and replacements therefor, including without limitation the following:

(i) All "<u>Accounts</u>", as defined in the Delaware Uniform Commercial Code ("<u>Code</u>"), together with any and all books of account, customer lists and other records relating in any way to the foregoing (including, without limitation, computer software, whether on tape, disk, card, strip, cartridge or any other form), and in any case where an account arises from

the sale of goods, the interest of Borrower in such goods. For the avoidance of doubt, all "Accounts" and other Collateral described in the preceding sentence that arise from or relate to the Borrower's business operations on or after the Petition Date shall be First Priority Collateral.

(ii)     All "Inventory" as defined in the Code, and all records relating in any way to the foregoing (including, without limitation, any computer software, whether on tape, disk, card, strip, cartridge or any other form).

(iii)    All "Chattel Paper" as defined in the Code, and all records relating in any way to the foregoing (including, without limitation, any computer software, whether on tape, disk, card, strip, cartridge or any other form).

(iv)     All "Equipment" as defined in the Code, of whatsoever kind and character now or hereafter possessed, held, acquired, leased or owned by Borrower and used or usable in Borrower's business, and in any event shall include, but shall not be limited to, all machinery, tools, computer software, computers, databases, servers, routers, office equipment, furniture, appliances, furnishings, fixtures, vehicles, motor vehicles, together with all replacements, accessories, additions, substitutions and accessions to all of the foregoing, and all manuals, instructions and records relating in any way to the foregoing (including, without limitation, any computer software, whether on tape, disk, card, strip, cartridge or any other form).

(v)      All "Instruments" as defined in the Code (including promissory notes), and all records relating in any way to the foregoing (including, without limitation, any computer software, whether on tape, disk, card, strip, cartridge or any other form).

(vi)     All "Documents" as defined in the Code, and all records relating in any way to the foregoing (including, without limitation, any computer software, whether on tape, disk, card, strip, cartridge or any other form).

(vii)    All "Deposit Accounts" as defined in the Code, and all records relating in any way to the foregoing (including, without limitation, any computer software, whether on tape, disk, card, strip, cartridge or any other form).

(viii)   All "Letter of Credit Rights" as defined in the Code, and all records relating in any way to the foregoing (including, without limitation, any computer software, whether on tape, disk, card, strip, cartridge or any other form).

(ix)     All "General Intangibles" as defined in the Code, and all records relating in any way to the foregoing (including, without limitation, any computer software, whether on tape, disk, card, strip, cartridge or any other form), including all permits, regulatory approvals, copyrights, patents, trademarks, service marks, trade names, mask works, computer software, goodwill, licenses and all other intellectual property owned by Borrower or used in Borrower's business.

(x)      All "Supporting Obligations" as defined in the Code, and all records relating in any way to the foregoing (including, without limitation, any computer software, whether on tape, disk, card, strip, cartridge or any other form).

(xi)     All claims or causes of action (but excluding any bankruptcy causes of action under Sections 544, 547, 548, 549, 550, 553 or otherwise under the Bankruptcy Code).

(xii)     The proceeds of all claims or causes of action under Sections 544, 547, 548, 549, 550, 553 or otherwise under the Bankruptcy Code For the avoidance of doubt, the proceeds of all claims or causes of action described in the preceding sentence shall be subject to Lender's Security Interest.

The assets described in this <u>Section 4(a)</u> are collectively referred to herein as the "Collateral."

(b)     In addition to Lender's Security Interests arising hereunder and under the other DIP Loan Documents, the Obligations shall be secured as set forth in the Financing Order.

(c)     To secure the payment and performance of the Obligations, Borrower hereby pledges, assigns, and transfers to Lender, and grants to Lender, Lender's Security Interest in and to, all of the Collateral and covenants to protect Lender's Security Interest in all of the Collateral. Lender's Security Interest shall, pursuant to the Financing Order, be deemed automatically perfected, without need for filing, recording or other action by any party.

4.     <u>Conditions Precedent</u>.  The obligation of Lender to make any advance under the DIP Facility is subject to each of the following conditions precedent that, as of the date of such advance, (i) Lender shall have received duly executed copies of each DIP Loan Document and any amendments or modifications thereto, in form and substance acceptable to Lender and its legal counsel, (ii) Lender shall have received a copy of any Financing Order entered by the Court in a form that is reasonably acceptable to Lender, shall be in full force and effect, and shall not have been reversed, modified, amended, stayed for a period of five business days or longer, vacated or subject to a stay pending appeal, in the case of any modification, amendment or stay pending appeal, in a manner, or relating to a matter, that is materially adverse to the interests of the DIP Lender; (iii) all representations and warranties made by any party to Lender in the DIP Loan Documents are true and correct, as if made on such date, (iv) no condition or event exists which constitutes an Event of Default or which, with the elapse of time and/or giving of notice, would constitute an Event of Default, (v) Borrower is compliant with the Draw Procedures stated in <u>Section 2 (Revolving Facility)</u> hereof, (vi) Lender shall be satisfied with the documentation and justification for the advance in its sole and absolute discretion and, without limitation may require such additional documentation as it may determine, and (vii) Borrower shall be in full compliance with the Financing Order and within the strict terms and limits of the Budget. For clarity, if Lender determines that the advance is not in the interest of, or prudent to, Lender in its sole and absolute discretion, Lender shall not be required to make the advance.

5.     <u>Representations and Warranties</u>. In order to induce Lender to provide the DIP Facility, Borrower represents and warrants to Lender that:

(a)     <u>Organization and Good Standing</u>.  Except as affected by the commencement of the Case, Borrower represents that it is in good standing in the State of Delaware;

(b)     <u>Authorization</u>.  Subject to the approval of the Court pursuant to the Financing Order, Borrower has full power and authority to enter into this Agreement, to make the borrowing hereunder, to execute and deliver the DIP Loan Documents and to incur the Obligations

provided for in the DIP Loan Documents, all of which have been duly authorized by all necessary corporate or company action, as the case may be;

(c)     <u>Enforceable Obligations</u>.  Subject to the approval of the Court pursuant to the Financing Order, the DIP Loan Documents to which Borrower is a party are the legal and binding obligations of Borrower, enforceable in accordance with their respective terms;

(d)     <u>No Conflicts or Consents</u>.  Subject to the approval of the Court pursuant to the Financing Order, neither the execution and delivery of this Agreement and the other DIP Loan Documents to which Borrower is a party, nor consummation of any of the transactions herein or therein contemplated, nor compliance with the terms and provisions hereof or thereof, will contravene or conflict with any provision of law, statute or regulation to which Borrower is subject or any judgment, license, order or permit applicable to Borrower; subject to the approval of the Court pursuant to the Financing Order, no consent, approval, authorization or order of any court, governmental authority or third party is required in connection with the execution and delivery by Borrower of this Agreement or any of the other DIP Loan Documents to which Borrower is a party or to consummate the transactions contemplated herein or therein;

(e)     <u>Budget</u>.  The Budget was prepared in good faith and represents Borrower's best estimate of its future financial performance;

(f)     <u>Full Disclosure</u>.  No written certificate or written statement herewith or heretofore delivered by Borrower to Lender in connection herewith, or in connection with any transaction contemplated hereby, contains any untrue statement of a material fact or fails to state any material fact necessary to keep the statements contained therein from being misleading; and

(g)     <u>Business Purposes</u>.  All advances evidenced by the Note are and shall be for business, commercial, investment or other similar purposes and not primarily for personal, family, household or agricultural use, as such teens are used in the Code.

6.     <u>Affirmative Covenants</u>.  Until payment in full of the Note and all other Obligations and liabilities of Borrower hereunder, Borrower agrees and covenants that (unless Lender shall otherwise consent in writing):

(a)     <u>Operating Reports</u>.  Borrower shall provide to Lender, as soon as available but no later than 5:00 p.m. Eastern Time on the last Friday of the rolling two-week period, a budget variance and reconciliation report setting forth: (i) a comparative reconciliation, on a line-by-line basis, of actual cash receipts and disbursements against the cash receipts and disbursements forecast in the Budget, and (ii) the percentage variance of the aggregate receipts and aggregate disbursements, for (A) the rolling two-week period ended on (and including) the last Sunday of the two-week reporting period and (B) the cumulative period to date, and (iii) projections for the following nine weeks, including a rolling cash receipts and disbursements forecast for such period.

(b)     <u>Compliance with Laws</u>.  Borrower shall conduct its business in an orderly and efficient manner consistent with good business practices and in accordance with all valid regulations, laws and orders of any governmental authority and will act in accordance with customary industry standards in maintaining and operating its assets, properties and investments, and shall not change the nature or type of its basic business;

(c)     Accounts and Records.  Borrower shall maintain complete and accurate books and records of its transactions in accordance with generally accepted accounting principles, and will give Lender access during business hours to all books, records and documents of Borrower and permit Lender to make and take away copies thereof;

(d)     Notice of Event of Default.  Borrower shall furnish to Lender, immediately upon becoming aware of the existence of any condition or event constituting an Event of Default or event which, with the lapse of time and/or giving of notice, would constitute an Event of Default, written notice specifying the nature and period of existence thereof and any action which Borrower is taking or proposes to take with respect thereto;

(e)     Insurance.  Borrower shall maintain all insurance coverage required by the Bankruptcy Administrator;

(f)     Maintenance of Licenses.  Borrower shall preserve and maintain all licenses, privileges, franchises, certificates, patents, regulatory approvals and the like necessary for the operation of its business;

(g)     Cash Collateral Accounts.  Borrower shall cause all cash collateral and proceeds of advances under the Note, together with Cash Collateral (as such terms is defined in the Bankruptcy Code) to be immediately deposited in the Cash Collateral Accounts upon receipt thereof and shall maintain such amounts in the Cash Collateral Accounts at all times, subject only to withdrawal of funds to be applied in accordance with the express terms of the Financing Order;

(h)     Sale Milestones.  Borrower shall comply with the following milestones for a sale of substantially all of the Borrower's assets (a "Bankruptcy Sale") in the Case (the "Sale Milestones"): (i) on or before July 29, 2024, an order approving bidding procedures and the terms of an auction shall have been entered by the Court; (ii) on or before August 30, 2024, an auction in connection with the Bankruptcy Sale shall have occurred; (iii) on or before September 9, 2024, an order approving the Bankruptcy Sale to the stalking horse bidder or winner of the auction, as applicable, shall have been entered by a Bankruptcy Court; and (iv) on or before September 30, 2024, the Bankruptcy Sale shall been consummated.  Nothing set forth in this section shall obligate the Borrower to complete a Bankruptcy Sale in the event that Borrower believes that the best interests of creditors would be served by an alternative restructuring pathway (e.g., confirmation of Chapter 11 Plan).  Lender shall have the right (but not the obligation) to credit bid up the full outstanding balance (with interest and fees) of the DIP Facility combined with any indebtedness incurred by the Borrower in favor of the Lender before the Petition Date;

(i)     Application of Unidentified Account Payments.  When an account debtor pays an Account and does not otherwise identify a specific Account against which such payment is to be applied, Borrower shall apply all such payments first against any post-petition Accounts owing from such account debtor and second to any pre-petition Accounts owing from such account debtor; and

(j)     Additional Information.  Borrower shall promptly furnish to Lender, at Lender's request, such additional financial or other information concerning assets, liabilities, operations and transactions of Borrower as Lender may from time to time reasonably request.

7. <u>Negative Covenants</u>. Until payment in full of the Note, DIP Facility, and all other Obligations and liabilities of Borrower hereunder, Borrower shall not (unless Lender shall otherwise consent in writing or as otherwise stated herein this Agreement):

(a) <u>Indebtedness</u>. Create, incur or assume any Indebtedness or borrow money, except for (i) the Note, (ii) Indebtedness existing as of the Petition Date, (iii) current liabilities for taxes and assessments incurred in the ordinary course of Borrower's business after the Petition Date, and (iv) Indebtedness incurred in the ordinary course of business incurred after the Petition Date (other than for borrowed funds or purchase money obligations) and provided all such liabilities, accounts and claims shall be promptly paid and discharged when due or in conformity with customary trade terms;

(b) <u>Liens</u>. Mortgage, assign, encumber, incur, assume or grant a security interest in or lien upon any of Borrower's assets;

(c) <u>Contingent Liabilities</u>. Endorse, guarantee or otherwise become liable for the obligations of any person, firm or corporation except for endorsements of negotiable instruments by Borrower in the ordinary course of business;

(d) <u>Liquidations, Mergers, Consolidations</u>. Liquidate (unless such liquidation is in order to comply with <u>Section 7 (h) Sale Milestones</u> stated herein), dissolve or reorganize; or merge or consolidate with, or acquire all or substantially all of the assets of, any other company, firm or association; or make or permit any other substantial change in its capitalization or its business;

(e) <u>Distributions</u>. Pay any dividends on any of Borrower's outstanding stock or membership interests, as the case may be;

(f) <u>Sale of Assets</u>. Sell any of its assets used or useful in its business, except in order to comply with <u>Section 7 (h) Sale Milestones</u> stated herein, unless replaced with assets of equal value;

(g) <u>Loans</u>. Own, purchase or acquire, directly or indirectly, any promissory notes, stock or securities of any other person, firm or corporation, other than securities guaranteed as to the principal and interest by the United States government; or make any loans or advances to any other person;

(h) <u>Transfer of Ownership</u>. Permit a transfer of any legal or equitable interest in its capital or other voting stock to others than the present holders thereof as previously disclosed to Lender;

(i) <u>Leases</u>. Create, incur, assume, or suffer to exist any lease obligation other than lease obligations incurred in the ordinary course of business of Borrower or make capital expenditures by lease, purchase or otherwise;

(j) <u>Capital Expenditures</u>. Expend or enter into any commitment to expend any amount for the acquisition or lease of tangible, fixed or capital assets, including repairs,

replacements and improvements, renewals or expenses incurred before the Petition Date, which are capitalized under proper accounting practice.

8. <u>Rights and Remedies</u>.  Lender may at any time or from time to time, without waiving any rights upon the occurrence of any Event of Default and without relieving Borrower of any Obligations to Lender hereunder or otherwise or to any third party:

(a) <u>Before or After Default</u>.  Before or after the occurrence of any Event of Default and subject to the rights created by the Carve-Out: (i) file such financing statements with respect hereto, with or without Borrower's signature, or a photocopy of this Agreement in substitution for a financing statement, as Lender may deem appropriate and to execute in Borrower's name such financing statements and amendments thereto and continuation statements which may require Borrower's signature; (ii) terminate Borrower's authority to sell, lease, otherwise transfer, manufacture, process, assemble or furnish under contracts of service any inventory or other Collateral as to which such permission has been given; (iii) endorse as Borrower's agent any instruments, documents or chattel paper in the Collateral; (iv) notify account debtors of Lender's Security Interest and/or to make payments directly to Lender (after which, any payments Borrower receives shall be held in trust for Lender, not commingled with any other property, and shall forthwith be turned over to Lender, with any necessary endorsements and assignments); (v) contact account debtors directly to verify information furnished by Borrower; (vi) take control of any proceeds from Accounts and use them to reduce any part of the Obligations; (vii) take any action Borrower is required to take or otherwise necessary to obtain, preserve, and enforce Lender's Security Interest, and maintain and preserve the Collateral, without notice to Borrower, and add costs of same to the Obligations, which shall be payable on demand and until paid shall accrue interest at the Maximum Interest Rate allowed by law; (viii) release Collateral in its possession to Borrower, temporarily or otherwise, without releasing its rights therein; or (ix) revoke any permission or waiver previously granted to Borrower.

(b) <u>After Default</u>.  Subject to the provisions of the Financing Order, upon the occurrence of any Event of Default beyond the applicable grace period set forth below and without further order of application of the Court: (i) declare the entire outstanding indebtedness of the DIP Facility, including but not limited to the entire unpaid principal balance, interest, fees, charges and expenses, to be immediately due and payable to Lender; (ii) terminate the DIP Facility, (iii) implement the Maximum Interest Rate on the entire outstanding indebtedness; (iv) take any other action or exercise any other right or remedy (including, without limitation, with respect to the liens in favor of Lender) permitted under the applicable DIP Loan Documents, or by applicable law; (v) take possession of the Collateral, and for that purpose Lender may, so far as Borrower can give authority therefor, enter upon and/or remain upon any premises on which the Collateral may be situated and sell, liquidate or collect Collateral on the premises or remove same therefrom; (vi) require Borrower to assemble any or all Collateral at such location or locations within the state(s) of Borrower's principal office(s) or at such other locations as Lender may designate; (vii) sell, pledge, assign, sue for, collect, compromise payment of, or make any other agreement with respect to any Collateral in Borrower's or Lender's name, make any other disposition of any Collateral, which disposition may be for cash, credit or any combination thereof, and Lender may purchase any Collateral at public or (if permitted by law) private sale, and in lieu of actual payment of any purchase price, may set off the amount of the price against the Obligations; (viii) file and prosecute registration and transfer applications with the appropriate agencies or authorities with respect to

any accounts and/or general intangibles; (ix) execute, deliver and record, in connection with any sale or other disposition of any Collateral, endorsements, assignments or other instruments of conveyance or transfer with respect to such Collateral; or (x) notify the post office authorities to change the address for delivery of mail of Borrower to an address designated by Lender and, receive, open and dispose of all mail addressed to Borrower.  Any automatic stay otherwise applicable to the Lender shall be modified so that upon the occurrence of an Event of Default and upon five (5) business days' prior written notice of such occurrence (a "Termination Notice"), in each case given to Borrower, and the U.S. Trustee, the Lender shall be entitled to exercise customary remedies including, without limitation, the right to realize on all Collateral and the right to exercise any remedy available under applicable law, in each case without obtaining any further relief or order of the Court unless, within such five (5) business day period, the Court has entered an order to the contrary.  Consistent with the foregoing sentence, section 362 relief from the stay in favor of Lender shall be embodied in any order approving the DIP Facility and the use of cash collateral.

(c)     Remedies for Lender's Benefit Only.  The rights and powers conferred on Lender hereunder are solely to protect its interests in the Collateral and shall not impose any duty upon it to exercise any such powers. Lender shall be accountable only for the amounts that it actually receives as a result of the exercise of such powers and neither it nor any of its officers, directors, partners, employees or agents shall be responsible to Borrower for any act or failure to act, except for Lender's own gross negligence or willful misconduct. Without limiting any of the foregoing, Lender shall have no duty as to the collection or protection of the Collateral or any income thereon, nor as to the preservation of rights against prior parties, nor as to the preservation of any rights pertaining thereto;

(d)     Remedies Cumulative.  All rights and remedies of Lender with respect to the Obligations or the Collateral, whether evidenced hereby or by any other instrument or papers, shall be cumulative and may be exercised singularly, alternatively, successively or concurrently at such time or at such times as Lender deems expedient.

(e)     Power of Attorney.  Borrower hereby irrevocably constitutes and appoints Lender and any officer or agent thereof, with full power of substitution, as its true and lawful attorneys-in-fact with full irrevocable power and authority in the place and stead of Borrower or in Lender's own name, for the purpose of carrying out the terms of this Agreement, to take any and all appropriate action and to execute any and all documents and instruments that may be necessary or desirable to accomplish the purposes of this Agreement, and hereby ratifying all that said attorney-in-fact shall lawfully do or cause to be done by virtue hereof. This power of attorney is coupled with an interest and shall be irrevocable so long as any part of the Obligations shall remain outstanding.

9.     Default.  An "Event of Default" shall exist if any one or more of the following events (individually, an "Event of Default" and collectively, "Events of Default") shall occur:

(a)     Borrower shall fail to pay when due any principal of, or interest on, the DIP Facility or any other fee or payment due hereunder or under any of the DIP Loan Documents;

(b)     Borrower shall seek to obtain additional financing without Lender's prior written consent;

(c)     Any representation or warranty made in any of the DIP Loan Documents shall prove to be untrue or inaccurate in any material respect as of the date on which such representation or warranty is made;

(d)     Default shall occur in the performance of any of the covenants or agreements of Borrower contained herein or in any of the other DIP Loan Documents;

(e)     Borrower shall attempt to amend, supplement, stay, vacate or otherwise modify the Financing Order;

(f)     An order shall be entered that amends, supplements, stays, vacates or otherwise modifies the Financing Order without the prior written consent of the Lender;

(g)     An order shall be entered avoiding, disallowing, subordinating, or recharacterizing any lien, claim, or interest held by Lender whether obtained before or after the Petition Date;

(h)     Borrower shall file a pleading contesting Lender's Security Interest, including a response in support of another pleading contesting Lender's Security Interest;

(i)     Borrower shall file an objection to Lender's claim including a response in support of another pleading contesting Lender's Security Interest;

(j)     From and after the date of entry thereof, any material provision of the Financing Order shall cease to be in full force and effect (or shall have been vacated, stayed, reversed, modified or amended), in each case without the consent of Lender;

(k)     Borrower shall make any payments on any Indebtedness of Borrower (other than as permitted under the Financing Order or permitted hereunder) arising before the Petition Date, except as expressly allowed by order of the Court or with the approval of Lender;

(l)     Borrower shall fail to comply with the terms of the Financing Order in any material respect;

(m)     Any DIP Loan Document shall cease, for any reason, to be in full force and effect or Borrower shall so assert in writing, or any DIP Loan Document shall cease to be effective to grant a perfected Security Interest on any material lien of Collateral described therein with the priority purported to be created thereby;

(n)     Borrower shall fail to satisfy any of the Sale Milestones;

(o)     Borrower shall fail to use the Draws in accordance with the terms of the Budget or this Agreement or the DIP Loan Documents;

(p)     Any levy, seizure, or attachment upon any Collateral by any third party;

(q)     Except as expressly allowed by the Court or with the approval of Lender, Borrower shall fill any pre-petition sales order where the buyer has prepaid before the Petition Date all or any portion of such order;

(r)     Any of the following shall occur: (i) the Case shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code, or (ii) Borrower's estate shall be substantively consolidated with any other estate or entity, or anyone shall seek conversion, dismissal or substantive consolidation; or (iii) a trustee, responsible officer or examiner with enlarged powers relating to the operation of Borrower's business shall be appointed or the Borrower shall be removed as a debtor in possession pursuant to Section 1185 of the Bankruptcy Code; or (iv) Borrower or any other party shall file an application for the approval of any other superpriority claim or other claim or right to payment (other than the Carve-Out, to the extent provided for herein) which is *pari passu* or senior to Lender's Security Interests; or (v) there shall arise or be granted any such *pari passu* or senior superpriority claim or other claim or right to payment (other than the Carve-Out, to the extent provided for herein); or (vi) Borrower shall terminate or suspend the operation of any portion of its business as presently conducted; or (vii) Borrower shall apply for or consent to the appointment of a receiver, trustee, or liquidator of itself, or of all or a substantial part of its assets; or (viii) unless consented to, such relief is granted pursuant to a motion by, the Lender, a Chapter 11 trustee, a responsible officer or an examiner with enlarged powers relating to the operation of the business of the Borrower (*i.e.*, powers beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) shall be appointed in the Chapter 11 Case; or (ix) Borrower shall be unable, or admit in writing its inability to pay its post-petition debts as they fall due.

10.     <u>Remedies Upon Event of Default</u>.  Immediately upon the occurrence of an Event of Default, Borrower's ability to use proceeds of the DIP Facility hereunder shall terminate and the DIP Facility shall become due and payable. Upon the occurrence of an Event of Default and following the giving of not less than five (5) business days' advance written notice (the "<u>Enforcement Notice</u>") to counsel to the Debtor, counsel to the Committee (if any) and the U.S. Trustee (the "<u>Notice Period</u>"), the Lender may exercise any remedies available to them under this Financing Order, the DIP Loan Documents and applicable non-bankruptcy law, including but not limited to (a) set off and apply immediately any and all amounts in accounts maintained by the Debtor against the DIP Facility; (b) take any and all actions necessary to take control of the Collateral, including any Cash Collateral; and (c) take any other actions or exercise any other rights or remedies permitted under the Financing Order, the DIP Loan Documents or applicable law, including foreclosure on and sale of all of the Collateral, to effect the repayment and satisfaction of the Obligations.  Unless the Court orders otherwise, the automatic stay pursuant to Bankruptcy Code section 362 shall be automatically terminated at the end of the Notice Period, without further notice or order of the Court, unless the Lender elects otherwise in a written notice to the Debtor shall be permitted to exercise all rights and remedies, including with respect to the Collateral (including, without limitation, any Cash Collateral), set forth in the Financing Order and the DIP Loan Documents, and as otherwise available at law without further order or application or motion to the Court, and without restriction or restraint by any stay under Bankruptcy Code sections 362 or 105 or otherwise.

11.     The net proceeds realized by Lender upon any such sale or other disposition of Collateral (after deducting the expenses of retaking, holding, preparing for sale, selling, or the like

and reasonable attorneys' fees and any other expenses incurred by Lender) shall, to the extent actually received in cash and subject to the rights created by the Carve-Out, be applied toward satisfaction of the Obligations. Lender shall account to Borrower for any surplus realized upon such sale or other disposition, and Borrower shall remain liable for any deficiency.

12.  Miscellaneous.

(a)  Waiver.  No failure to exercise, and no delay in exercising, on the part of Lender, any right hereunder shall be: (i) delivered personally; (ii) sent by documented overnight delivery exercise thereof preclude any other or further exercise thereof or the exercise of any other right. The rights of Lender hereunder and under the other DIP Loan Documents shall be in addition to all other rights provided by law. No notice or demand given in any case shall constitute a waiver of the right to take other action in the same, similar or other instances without such notice or demand.

(b)  Notices.  Any notice or other communication given under this Agreement shall be in writing and shall be: (i) delivered personally; (ii) sent by documented overnight delivery service; (iii) sent by facsimile transmission, provided that a confirmation copy thereof is sent no later than the Business Day following the day of such transmission by documented overnight delivery service or first class mail, postage prepaid (certified or registered mail, return receipt requested); or (iv) sent by first class mail, postage prepaid (certified or registered mail, return receipt requested). Such notice shall be deemed to have been duly given: (w) on the date of the delivery, if delivered personally; (x) on the Business Day after dispatch by documented overnight delivery service, if sent in such manner; (y) on the date of facsimile transmission, if so transmitted; or (z) on the fifth Business Day after sent by first class mail, postage prepaid, if sent in such manner. Notices or other communications shall be directed to the following addresses:

Notices to Borrower:

StoryFile, Inc.
75 South Broadway, 4th Floor
White Plains, NY 10601
James.Fong@storyfile.com

With copy to:

Gabriel del Virginia
Law Offices of Gabriel del Virginia
30 Wall Street, 12th Floor
New York, NY 10005
gabriel.delvirginia@versizon.net

Notices to Lender:

Key 7 Investment Company, Inc.
2183 Parkway Lake Drive

Birmingham, AL 35244
steven@key7i.com

With copy to:

Jeremy Retherford
Balch & Bingham LLP
1901 Sixth Avenue North, Suite 1500
Birmingham, AL 35203
jretherford@balch.com

Electronic mail and Internet and intranet websites may be used only to distribute routine communications, such as financial statements and other information as provided in <u>Section 7(Affirmative Covenants)</u> and (b), and to distribute DIP Loan Documents for execution by the parties thereto, and may not be used for any other purpose. Any party may change its address for purposes of this Agreement by giving notice of such change to all other parties pursuant to this paragraph.

(c)     <u>Governing Law</u>.  This Agreement and the other DIP Loan Documents are being executed and delivered, and are intended to be performed, in the State of New York, and the substantive laws of New York shall govern the validity, construction, enforcement and interpretation of this Agreement and all other DIP Loan Documents.

(d)     <u>Invalid Provisions</u>.  If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws effective during the term of this Agreement, such provision shall be fully severable and this Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Agreement, and the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Agreement.

(e)     <u>Maximum Interest Rate</u>.  Regardless of any provisions contained in this Agreement, any Note or in any of the other DIP Loan Documents, Lender shall never be deemed to have contracted for or be entitled to receive, collect or apply as interest on any Note, any amount in excess of the maximum rate of interest (the "<u>Maximum Interest Rate</u>") permitted to be charged by applicable law, and, in the event Lender ever receives, collects or applies as interest any such excess, such amount which would be excessive interest shall be deemed to be a partial prepayment of principal and treated hereunder as such, and, if the principal balance of any Note is paid in full, any remaining excess shall forthwith be paid to Borrower. In determining whether or not the interest paid or payable under any specific contingency exceeds the Maximum Interest Rate, Borrower, and Lender shall, to the maximum extent permitted under applicable law, (i) characterize any non-principal payment (other than payments which are expressly designated as interest payments hereunder) as an expense, fee, or premium, rather than as interest, (ii) exclude voluntary prepayments and the effect thereof, and (iii) spread the total amount of interest throughout the entire contemplated term of any Note so that the interest rate is uniform throughout such term.

(f)     Entirety' and Amendments.  The DIP Loan Documents embody the entire agreement between the parties and supersede all prior agreements and understandings, if any, relating to the subject matter hereof and thereof, and this Agreement and the other DIP Loan Documents may be amended only by an instrument in writing executed by the party, or an authorized officer of the party, against whom such amendment is sought to be enforced.

(g)     Parties Bound.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; provided, however, that Borrower may not, without the prior written consent of Lender, assign any rights, powers, duties or obligations hereunder.

(h)     Headings.  Paragraph and section headings are for convenience of reference only and shall in no way affect the interpretation of this Agreement.

(i)     Construction and Conflicts.  The provisions of this Agreement shall be in addition to those of the Note, the DIP Loan Documents and any guaranty, pledge or security agreement, note or other evidence of liability held by Lender, all of which shall be construed as complementary to each other. Nothing herein contained shall prevent Lender from enforcing the Note, the DIP Loan Documents and any and all other notes, guaranty, pledge or security agreements in accordance with their respective terms. To the extent of any conflict or contradiction between the terms hereof and the terms of the Note, the DIP Loan Documents or any other document executed in connection herewith, the terms hereof and the Financing Order shall control.

(j)     Financial Terms.  As used in this Agreement, all financial and accounting terms not otherwise defined herein shall be defined and calculated in accordance with generally accepted accounting principles consistently applied.

(k)     Expenses of Lender.  Borrower agrees to pay all costs and expenses of Lender (including, without limitation, the reasonable attorneys' fees of Lender's legal counsel) incurred by Lender in connection with the preservation and enforcement of Lender's rights under this Agreement, the Note and/or the other DIP Loan Documents, and all reasonable costs and expenses of Lender (including, without limitation, the reasonable fees and expenses of Lender's legal counsel) in connection with the negotiation, preparation, execution and delivery of this Agreement and the other DIP Loan Documents up in an amount not to exceed $25,000, and any and all additional expenses incurred relating to any and all amendments, modifications and supplements thereof or thereto, as well as all costs and expenses related to all necessary motions and orders necessary to effectuate this Agreement, including the Financing Order.  There shall be no commitment fee or exit fee owed by Borrower to Lender in relation to the DIP Facility.

(l)     Consultation with Borrower's Counsel.  Borrower acknowledges that it has consulted with counsel and with such other experts and advisors as it has deemed necessary in connection with the negotiation, execution and delivery of this Agreement and documents related thereto. This Agreement and any documents related thereto shall be construed without regard to any presumption or rule requiring that they be construed against the party causing them or any part thereof to be drafted.

(m)   <u>Counterparts</u>.  This Agreement may be separately executed in any number of counterparts, each of which shall be an original, but all of which, taken together, shall be deemed to constitute one and the same instrument.

(n)   <u>Facsimile Documents and Signatures</u>.  For purposes of negotiating and finalizing this Agreement, if this document or any document executed in connection with it is transmitted by facsimile machine, it shall be treated for all purposes as an original document. Additionally, the signature of any party on this document transmitted by way of a facsimile machine shall be considered for all purposes as an original signature. Any such faxed document shall be considered to have the same binding legal effect as an original document. At the request of any party, any faxed document shall be re-executed by each signatory party in an original form.

13.   <u>JURY WAIVER</u>. BORROWER AND LENDER (BY ITS ACCEPTANCE HEREOF) HEREBY VOLUNTARILY, KNOWINGLY, IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) BETWEEN OR AMONG BORROWER AND LENDER ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT, ANY OTHER RELATED DOCUMENT, DIP LOAN DOCUMENT, OR ANY RELATIONSHIP BETWEEN LENDER AND BORROWER. THIS PROVISION IS A MATERIAL INDUCEMENT TO LENDER TO PROVIDE THE DIP FACILITY.

14.   <u>NO ORAL AGREEMENTS</u>. THIS AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

**IN WITNESS WHEREOF**, each of the parties hereto has caused this Agreement to be signed in its corporate name by its duly authorized officer, all as of the date first above written.

**BORROWER:**

**STORYFILE, INC.**

By: _____

Name: _____

Title: _____

**LENDER:**

**KEY 7 INVESTMENT COMPANY, INC.**

By: _____

Name: _____

Title: _____